# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| In re: ) | |
| ) | |
| FRANK OSCAR JACKSON (Deceased) ) | |
| and CORA MAE JACKSON, ) | Case No. 03-47174-JWV |
| ) | |
| Debtors. ) | |
| ) | |
| FRANK OSCAR JACKSON (Deceased) ) | |
| and CORA MAE JACKSON, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Adversary No. 04-4041-JWV |
| ) | |
| DAN HOLIDAY FURNITURE, LLC, ) | |
| ) | |
| ) | |
| Defendant. ) | |

## **MEMORANDUM OPINION**[1]

This matter came before the Court on the complaint of Frank Oscar Jackson and Cora Mae Jackson (collectively the "Debtors") alleging that Dan Holiday Furniture, LLC ("Dan Holiday") violated the automatic stay of the Bankruptcy Code when it engaged in collection actions directed at the Debtors after it received notice of the Debtors' Chapter 13 bankruptcy filing. The Court held a trial in this matter on April 12, 2004, in Kansas City, Missouri, at which time the Court orally ruled that Dan Holiday's actions violated the automatic stay and were sanctionable. This Memorandum Opinion supplements and

---

[1] The Plaintiff originally named "Dan Holiday Furniture" as the Defendant. No objection was ever raised that "Dan Holiday Furniture" was not a legal entity, but the Court raised this issue at the conclusion of the trial. Subsequently, the Plaintiffs filed a Motion (Document # 9) asking that the Complaint be amended to show "Dan Holiday Furniture, LLC" as the Defendant, inasmuch as that is the legal name shown on the Missouri Secretary of State's records. That Motion has not been objected to, and will be granted.

memorializes the Court's ruling from the bench and establishes the amount of damages awarded to the Debtors.[2]

## I. BACKGROUND

Dan Holiday is a fifty-two-year old family business owned by Chris Wilcoxon ("Wilcoxon") and her mother, Alice Bokonich. Wilcoxon has worked in the business for the past thirty-two years and is in charge of the daily operations. Wilcoxon's sister, Judith A. Bokonich, also works in the store, assisting in collections, among other things. Wilcoxon testified that during her time as manager of the store several customers have filed bankruptcy, and when that happens, she makes a special customer file and follows instructions on filing a proof of claim. However, Wilcoxon admitted that she has seldom filed a proof of claim in a bankruptcy proceeding because her customers usually pay for their furniture despite the bankruptcy filing.

In April 2003, the Debtors purchased a recliner chair on credit from Dan Holiday. The Debtors made several payments on their purchase, but missed the November 2003 payment. On November 17, 2003, the Debtors filed a petition under Chapter 13 of the Bankruptcy Code. Dan Holiday received the customary notice of the Debtors' bankruptcy in the mail, but when the notice was received, Wilcoxon was absent with the flu and she could not remember when she first saw the notice. The notice specifically stated that the creditor was to cease collection activity or else the creditor could be penalized for violating the Bankruptcy Code. In the meantime, Dan Holiday did not receive its installment payment on the recliner for November and a Dan Holiday collector telephoned the Debtors' household to inform the Debtors that they had missed the payment. In fact, a Dan Holiday collector – either Judith Bokonich or another employee, Mary Gardner – called the Debtors' household ten times between November 15 and December

---

[2] This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052. The Court has jurisdiction in this matter under 28 U.S.C. §§ 1334 and 157.

2

1, 2003. Cora Jackson was not at home when those telephone calls were made because she was hospitalized from November 8 to December 1, 2003.

On November 30, 2003, a collector from Dan Holiday made a personal visit to the Debtors' home and left a sticker or card in the door that threatened repossession of the chair. The next day, December 1, 2003, Cora's husband, Frank – without Cora's knowledge – went to Dan Holiday to pay his delinquent account. He paid not only the $130.00 owed for November, but also the $130.00 owed for December. Wilcoxon acknowledged that Frank had informed her that he and Cora had filed bankruptcy, but Frank allegedly told Wilcoxon not to worry because the Debtors did not want to include Dan Holiday as a creditor in their bankruptcy; rather, the Debtors allegedly preferred to continue making payments on their recliner directly to Dan Holiday.[3] Just three days later, on December 4, 2003, Wilcoxon received the Debtors' Chapter 13 plan and plan summary, which provided that Dan Holiday was to be fully paid through the plan. Wilcoxon testified that she disregarded the mailing because Frank had told her not to worry about the bankruptcy filing. Based on Frank's representation, Dan Holiday never set up a bankruptcy file for the Debtors as it usually did for other bankrupt customers.

On December 4, 2003, Frank entered the hospital, seriously ill. He died there on December 30, 2003. His funeral was held on January 3, 2004.

It appears from the evidence that the employees at Dan Holiday learned of Frank's death in early January 2004. Nevertheless, when the Debtors did not make their payment for the month of January, a collector telephoned the Jackson household fourteen times between January 14 and January 31, 2004, and either spoke to Cora's granddaughter or left a message on an answering machine. Cora testified that she never spoke with anyone from Dan Holiday and did not return their telephone calls because her attorney had told her not to speak with any bill collectors after she filed bankruptcy. In February 2004, Dan Holiday's records only reflect one telephone call made to Cora on February 2, 2004, and its records reflect that it sent a truck to the Debtors' residence on February 18, 2004. In stark contrast to those records,

---

[3] Judith Bokonich testified that Dan Holiday's employees knew prior to December 1 that the Debtors were filing bankruptcy. She stated: "I knew he was going to file bankruptcy, we had all talked about it...[I]t was before December 1."

Cora documented with specific times twelve telephone calls from Dan Holiday from February 2 to February 19, 2004, seeking payment on her account.[4]  When Cora returned home on February 18, 2004, she found seven bright yellow slips of paper in her door jamb or storm door stating that a Dan Holiday truck had stopped by to repossess her furniture.[5]  Seeing the yellow stickers on her door upset and embarrassed Cora.  Also on February 18, 2004, Dan Holiday sent Cora a letter stating that she had twenty-four hours to bring her account current or else "**Repossession** Will Be Made and **Legal Action Will Be Taken**."  On February 18, 2004, Cora spoke with her bankruptcy attorney.  The attorney contacted Dan Holiday and thereafter all collection activity ceased.  This adversary proceeding quickly followed.

## II. DISCUSSION

Upon the filing of a bankruptcy petition, a bankruptcy estate is created consisting of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The automatic stay set out in 11 U.S.C. § 362(a) prohibits the commencement or continuation of any action that could have been pursued pre-petition to recover a claim against the debtor that arose before the commencement of the bankruptcy case and forbids any act by a pre-petition creditor to obtain possession

---

[4] Cora taped two of the messages from her answering machine.  One of those messages stated: "Hello.  This is Judy over at Dan Holiday Furniture.  And this is the last time I am going to call you.  If you do not call me I will be at your house.  And I expect you to call me today.  If there is a problem I need to speak to you about it.  You need to call me.  We need to get this thing going.  You are a January and February payment behind.  And if you think you are going to get away with it, you've got another thing coming."
Judith Bokonich admitted that the voice on the recording was hers and that she made the call.

[5] Mary Gardner, one of Dan Holiday's collectors, insisted that she left only a single card in the door.  In view of the fact that counsel for the Debtors offered six of the bright yellow cards in evidence, the Court does not find Gardner's testimony credible.  What is not disputed is that the card(s) read: "OUR TRUCK was here to **REPOSSESS** Your furniture (sic).  241-6933.  Dan Holiday Furn. & Appl. Co."  Apparently, "sending a truck" to a delinquent customer's home was merely a ruse designed to frighten the customer into paying.  Chris Wilcoxon testified that Dan Holiday doesn't actually send a truck to the delinquent customer's residence much of the time and that they don't want to pick up the furniture.  Rather, they simply want to talk directly to the customer about making payments.  The intent to intimidate is transparent.

of property of the bankruptcy estate. 11 U.S.C. § 362(a)(1) and (3). An individual injured by a creditor's violation of the automatic stay "shall recover actual damages, including costs and attorneys' fees, and in appropriate circumstances, may recover punitive damages." § 362(h). Before a debtor can recover under § 362(h), the debtor must show that the creditor's violation of the automatic stay was willful and that the debtor was injured. *Lovett v. Honeywell, Inc. (In re Transportation Systems International, Inc.)*, 930 F.2d 625, 628 (8th Cir. 1991). "A willful violation of the automatic stay occurs when the creditor acts deliberately with knowledge of the bankruptcy petition." *Knaus v. Concordia Lumber Co. (In re Knaus)*, 889 F.2d 773, 775 (8th Cir. 1989).

Regarding the necessity of an "injury," the Court notes that an "injury" is broadly defined as being "a violation of another's legal right, for which the law provides a remedy." *Black's Law Dictionary* 789 (7th ed. 1999). The automatic stay is a legal right afforded to debtors that, in part, protects them from continued collection actions by their creditors. H.R. Rep. No. 595, 95th Cong., 1st Sess. 174-75 (1977) (stating that "[t]he automatic stay is one of the fundamental debtor protections .... [giving] the debtor a breathing spell from all his creditors .... [stopping] all collection efforts, all harassment, and all foreclosure actions."). Thus, the mere violation of the automatic stay constitutes an injury to the debtor inasmuch as the creditor's violation restricts the debtor's breathing spell and subjects the debtor to continued collection efforts, possibly including harassment and intimidation. There is no requirement that a debtor must prove a quantum of actual damages to successfully sue a creditor for violating the automatic stay. Other courts have added "actual damages" to the requirements of a "wilful violation" and an "injury," a requirement that this Court rejects as being extra-statutory and unauthorized. *See e.g.*, *Aiello v. Providian Financial Corp. (In re Aiello)*, 239 F.3d 876, 878, 881 (7th Cir. 2001) (affirming dismissal of a suit when the debtor failed to present evidence of actual damages, holding that without a showing of financial loss the debtor's claim must fail). Indeed, a failure to provide remedies for violations of the automatic stay that do not result in quantified financial damages disembowels the protections afforded to debtors by 11 U.S.C. § 362 because, in the absence of exceptional circumstances, creditors could believe that continuing their collection activities in the hopes of coercing payments would only be a "technical" violation of the automatic stay for which they might not be held accountable. Actual damages are a matter of proof, and in the absence of

5

such proof, a nominal award for actual damages serves as a vindication of a debtor's rights. *Solfanelli v. Meridian Bank (In re Solfanelli)*, 230 B.R. 54, 69 (M.D. Pa. 1999) (affirming a bankruptcy court's award of $1.00 in nominal damages and $10,000.00 in punitive damages for violating the automatic stay), *aff'd* 203 F.3d 197, 203 (3rd Cir. 2000). *See also Lampert v. Judge and Dolph Drug Co.*, 141 S.W. 1095, 1097 (Mo. 1911) (holding that Missouri law provides that nominal damages may be awarded in lieu of actual damages where there is an inadequate showing as to the quantum of damages and that the nominal award will also support an award for punitive damages).[6]

In this case, there is no question that Dan Holiday repeatedly violated the automatic stay and that the violations were willful. The Debtors filed bankruptcy on November 17, 2003, and a notice of their bankruptcy was mailed to Dan Holiday. The customary notice expressly stated that creditors could be penalized for violating the Bankruptcy Code for continuing any collection activity. Nevertheless, Dan Holiday made ten telephone calls to the Debtors' household between November 15 and December 1, 2003, and even sent a collector to the Debtors' house on November 30, 2003. While the record is not

---

[6] In *Lovett*, 930 F.2d at 629, the Eighth Circuit interpreted 11 U.S.C. § 363(h) – based on the narrow set of facts presented in that case – as requiring actual damages before a party could recover attorneys' fees under the statute because "costs and attorneys' fees, by the terms of § 362(h) are allowable only to embellish 'actual damages.'" (quoting *Whitt v. Philadelphia Housing Authority*, 79 B.R. 611, 616 (Bankr. E.D. Pa. 1987)). *Whitt* is a case arising out of the Third Circuit, and whether the statement made in *Whitt* has continuing validity in light of the Third Circuit's affirmation of nominal damages for violations of the automatic stay in *Solfanelli*, 203 F.3d at 203, is suspect. Missouri law allows the imposition of nominal damages when a party fails to quantify actual damages, and that nominal award is sufficient to support an award for punitive damages. *Lampert*, 141 S.W. at 1097. If a nominal award under state law is sufficient to support an award for punitive damages, it would certainly be sufficient to support an award of attorneys' fees. While the Bankruptcy Code provides the mechanism for asserting and enforcing rights, in the absence of a federal statute, the substance of those rights is provided by state law. *See Royal Indem. Co. v United States*, 313 U.S. 289, 296-97, 61 S. Ct. 995, 85 L. Ed. 1361 (1941) (providing – in a case arising under federal law – that the interest rate to be part of the recovery for delayed payment was not controlled by state statute or by state common law; rather it was a determination for the federal courts, but while the state statute was not controlling, its rate of interest would be applied because a suitable measure for damages is what the state where the cause of action arose would allow). *See generally*, *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 791 F.2d 524, 532 (7th Cir. 1986) ("Bankruptcy law provides a federal machinery for enforcing creditors' rights but the rights themselves are created by state law.").

clear as to when Dan Holiday had actual knowledge of the Debtors' bankruptcy after receiving the notice of bankruptcy in the mail, the Court finds that Dan Holiday had actual knowledge of the bankruptcy before December 1, 2003. The Court also finds that as a direct result of Dan Holiday's collection efforts, Frank Jackson traveled to Dan Holiday's place of business on December 1, 2003 and made the November and December installment payments, totaling $230.00. When Frank made those payments, he specifically informed Dan Holiday that he and Cora had filed bankruptcy. Nevertheless, Dan Holiday accepted the payments. Three days later, the Debtors' Chapter 13 plan was mailed to Dan Holiday. Wilcoxon testified that she received the plan, which provided a mechanism to pay the Debtors' obligation to Dan Holiday in full, but she chose to ignore it based on Frank's alleged representations that Dan Holiday would be paid directly by the Debtors.

After Dan Holiday failed to receive an installment payment for the month of January 2004, a collector telephoned the Jackson household fourteen times between January 14 and January 31, 2004. While Dan Holiday's records only reflect one telephone call to the Debtors' household in February 2004, Cora credibly documented, by precise time and date, twelve telephone calls in the month of February. Dan Holiday mailed a dunning letter to Cora on February 18, 2004, threatening legal action and repossession. Finally, Dan Holiday sent a collector to the Debtors' household on February 19, 2004, and that person inserted numerous repossession notices in the Debtors' door jamb that threatened – in large, bold print and without reservation – to repossess the Debtors' furniture.     Based on these facts, the Court finds that the Debtors suffered financial damages in the amount of $230.00, which represents the coerced payments that Dan Holiday received from Frank Jackson on December 1, 2003.

As for damages for emotional distress, the Court notes that medical or other expert evidence is not required to prove emotional distress and that Cora's own testimony, under the particular circumstances of this case, may be sufficient to prove entitlement to damages. *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1065 (8th Cir. 1997). Nevertheless, before the Court can award damages for emotional distress, Cora must present competent evidence of genuine injury. *Forshee v. Waterloo Industries, Inc.*, 178 F.3d 527, 531 (8th Cir. 1999). *See also Browning v. President Riverboat Casino-Missouri, Inc.*, 139 F.3d 631,

636 (8th Cir. 1998) (noting that "claims with respect to emotional distress damages require proof of evidence of the nature and extent of emotional harm caused by the alleged violation.").

Although Cora testified that she was embarrassed by the repossession notices stuck in her door jamb, and that the repeated telephone calls were harassing – especially in light of Frank's recent death – Cora has not proved any entitlement to a quantity of damages for her emotional distress. Cora suffered no physical injury, she was not medically treated for any psychological or emotional injury, and no other witness corroborated any outward manifestation of emotional distress. While these actions were undoubtedly annoying and embarrassing, the Court notes that Cora likely could have ended the harassment early on by asking her attorney to speak with Dan Holiday about its continued collection efforts. Under the circumstances of this case, the Court finds that a nominal award of $1.00 is an appropriate amount of compensation for Cora's emotional distress caused by Dan Holiday's repeated violations of the automatic stay in January and February 2004.

We turn now to the issue of punitive damages. Before punitive damages may be recovered, "appropriate circumstances" must exist, which requires egregious, intentional misconduct on behalf of the violating creditor. *United States v. Ketelsen*, 880 F.2d 990, 993 (8th Cir. 1989). In setting the amount of punitive damages, the court must consider both the nature of the defendant's conduct and the ability of the defendant to pay. *Armstrong v. Republic Realty Mortgage Corp.*, 631 F.2d 1344, 1351-52 (8th Cir. 1980) (applying Missouri law).

The Court finds that punitive damages are warranted in this case based on Dan Holiday's egregious, intentional violations of the automatic stay. Dan Holiday's conduct was remarkably bad in that, after it had actual knowledge of the Debtors' bankruptcy, it chose not to follow its own standard operating procedures for customers in bankruptcy, and after coercing payments from the Debtors covering the months of November and December 2003, it made no less than twenty-six telephone calls to the Debtors' household in January and February. Having knowledge of the Debtors' bankruptcy from the customary notice issued in all bankruptcy cases, from the direct representations of Frank Jackson, and from receipt of the Debtors' Chapter 13 plan, Dan Holiday's continued collection efforts were in flagrant violation of the protections Congress afforded to debtors under the automatic stay.

Certainly, the actions of Dan Holiday are not the worst to have come before the courts, but the conduct of its employees in this case is egregious and offensive. *See, e.g., Knaus*, 889 F.2d at 776 (affirming an award of $750.00 in punitive damages when a creditor attempted to have the debtor excommunicated from his church in a brazen attempt to punish the debtor for pursuing his rights under the Bankruptcy Code); *Budget Serv. Co. v. Better Homes of Va., Inc.*, 804 F.2d 289, 290 (4th Cir. 1986) (awarding punitive damages of $10,000.00 when the debtor was injured during the repossession of leased vehicles and one of creditor's agents effecting the repossession carried a firearm); *Nissan Motor Acceptance Corp. v. Baker*, 239 B.R. 484, 486, 490 (N.D. Tex. 1999) (affirming a punitive damage award of $23,000.00 after a creditor wilfully violated the automatic stay by exercising self-help to repossess and sell estate property); *In re Wagner*, 74 B.R. 898, 900-01, 905 (Bankr. E.D. Pa. 1987) (awarding $500.00 in punitive damages when a creditor burst into the debtor's home, turned off the lights, held a finger to the debtor's head and screamed: "I'm not playing, next time I'm going to blow your brains out, bring a gun and I'll blow your brains out.").

In this matter the Court is somewhat hampered in assessing punitive damages by the lack of evidence concerning the ability of Dan Holiday to pay. Wilcoxon testified that Dan Holiday was a family-owned business that has been in existence for 52 years, and the Court assumes that it is a relatively small business. Nevertheless, the evidence in this case demonstrates a complete and knowing disregard of the bankruptcy laws and direct and repeated violations of the automatic stay of the Bankruptcy Code. From her experience with earlier bankruptcy cases, Wilcoxon was familiar with the requirements for filing a proof of claim but admitted that she had seldom (or never) done so and had continued to receive payments directly from bankruptcy debtors. Under the circumstances of this case, the Court believes that an appropriate penalty would be $100.00 for each illegal contact with the Debtors after December 1, 2003, when it is crystal clear that Dan Holiday had actual knowledge of the Debtors' bankruptcy filing, for a total of $2,800.00. The Court believes that this penalty will be sufficient to sting the pocketbook of Dan Holiday and impress upon Dan Holiday and its owners and employees the importance of debtor protections under the Bankruptcy Code, as well as to deter further transgressions.

### III. CONCLUSION

For the reasons set out hereinabove, the Court finds that Dan Holiday had actual knowledge of the Debtors' bankruptcy filing and nevertheless willfully and repeatedly violated the automatic stay. The Debtors suffered $230.00 in financial damages, and $1.00 in other compensatory, actual damages. Based on the egregious nature of Dan Holiday's conduct, the Court finds that an award of $2,800.00 in punitive damages is appropriate and should serve as a sufficient deterrent to prevent Dan Holiday from violating the automatic stay in the future. The Court also will award the Debtors their attorneys' fees and costs in the amount of $1,142.42, an amount the Court considers eminently fair and reasonable under the circumstances of this case.

This opinion constitutes the Court's findings of fact and conclusions of law. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

**ENTERED** this 28th day of April 2004.

/s/ Jerry W. Venters
HONORABLE JERRY W. VENTERS
UNITED STATES BANKRUPTCY JUDGE

A copy of the foregoing mailed electronically or
conventionally to:
Maurice B. Soltz
Preston L. Cain
Richard Fink